IN RE CHRISTOPHER L.*
(AC 33803)

Beach, Robinson and Sheldon, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued January 31—officially released April 17, 2012**

*Erich H. Gaston,* with whom was *Alison Gaston,* for the appellant (respondent mother).

*Stephen G. Vitelli,* assistant attorney general, with whom, on the brief, were *George Jepsen,* attorney general, and *Benjamin Zivyon,* assistant attorney general, for the appellee (petitioner).

*Opinion*

ROBINSON, J. The respondent mother, Shanequa L., appeals from the judgment of the trial court terminating

---

** April 17, 2012, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

her parental rights with respect to her minor son, Christopher L.[1] On appeal, the respondent contends that the trial court erred in (1) terminating her parental rights when she did not have notice that the petitioner, the commissioner of children and families, would attempt to prove that the department of children and families (department) made reasonable efforts at reunification because the petition did not allege reasonable efforts at reunification, (2) concluding that the department made reasonable efforts to reunify the child with the respondent and (3) concluding that the respondent had failed to achieve sufficient personal rehabilitation. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the resolution of the respondent's claims. The respondent had two children, Christopher, and a daughter who was eighteen at the time of trial. Christopher was born on August 8, 2005. The department has been involved with the family since 2006. On December 23, 2006, the respondent was driving while intoxicated when she rear-ended a car and left the scene of the accident. Both of her children were in the car at the time of the accident. When she was apprehended by the police shortly thereafter, she admitted to the accident but did not take responsibility for her actions. The respondent was charged with operating a motor vehicle while under the influence of intoxicating liquor, two counts of risk of injury to a child,[2] following too closely and evading responsibility.

---

[1] The petition also sought to terminate the parental rights of Christopher's father, Dwayne W. Dwayne W. had court-appointed counsel, and although appearing at some prior proceedings, failed to appear for trial. The court determined that Dwayne W. had abandoned the child under General Statutes § 17a-112 (j) (3) (A). Dwayne W. is not a party to the present appeal. Therefore, we refer to Shanequa L. as the respondent.

[2] At the time of the arrest, the respondent's daughter was under the age of eighteen.

On May 24, 2007, a department social worker visited the foster home of one of her clients who was unrelated to this case. At the foster home, the social worker found the respondent intoxicated with both of her children present. The social worker reported that the respondent "ran into the fence at the home with her car, breaking the side mirror and scratching the side of her car." The department thereafter invoked a ninety-six hour hold for Christopher and placed him in a foster home.

On June 25, 2007, the respondent was admitted to the inpatient program at Coventry House, a substance abuse treatment facility for mothers and their children. On June 29, 2007, the respondent arrived at Coventry House intoxicated. On July 31, 2007, the court, *Dannehy, J.*, adjudicated the two children neglected. Christopher was placed with his mother at Coventry House. The respondent actively participated in many of the programs that Coventry House offered but was discharged on October 29, 2007, after she engaged in an altercation with another resident. Christopher was thereafter placed in his previous foster home.

The children and the respondent were reunited on May 1, 2008. The respondent at that time was sober for eleven months and had completed numerous programs to help in her recovery.[3]

On September 4, 2009, the respondent was arrested for operating a motor vehicle while under the influence of intoxicating liquor. The respondent had parked her car on a sidewalk, was sitting in the driver's seat with no pants on and had urinated on herself. Because there were no children with her in the car, the department was not notified of the respondent's September 4, 2009

---

[3] The respondent completed the following programs prior to the time that she was reunited with her children on May 1, 2008: alcohol education, parenting education, anger management, life skills, group therapy, an addiction workshop, medication management and outpatient therapy.

arrest. The respondent was found guilty of operating a motor vehicle while under the influence of intoxicating liquor and was sentenced to six months in jail, execution suspended, with one year of probation.

On September 7, 2010, the respondent drove into a secured gated area at the J.C. Penney in Manchester. Christopher was in the car at the time. The responding officer reported that when confronted at that location, the respondent was slurring her words and had an unsteady gait. The police found three empty bottles of Smirnoff vodka under the seat in the respondent's vehicle and the respondent's blood alcohol levels were .24 and .23. The respondent was arrested for operating a motor vehicle while under the influence of intoxicating liquor, risk of injury to a child and driving with a suspended license, and was sentenced to two years in jail, execution suspended after 120 days, with two years of probation. A family friend initially took in Christopher; thereafter, he was placed with his paternal grandparents.[4]

The respondent was released from jail in January, 2011. Thereafter, beginning on April 29, 2011, she attended a four week program called Strive, which works on personal development, employment skills and team building. She also completed the STEPS program in May, 2011, which is a mental health and substance abuse program. She had consistent attendance in the program and tested negative for drugs and alcohol in all urine screens and Breathalyzer tests administered to her. She also participated in individual counseling and women's trauma groups. In addition, in June, 2011, she reported that she had obtained a job with her former employer as a certified nurse's aide. At the time of trial,

---

[4] Christopher remained with his paternal grandparents until June 24, 2011, when he was placed with the foster family with whom he had previously resided. As of the time of the hearing, Christopher had spent twenty-three months in the care of the department in total.

she was attending Alcoholics Anonymous groups and had obtained a sponsor.

On September 14, 2010, the department filed a coterminous petition seeking to adjudicate Christopher neglected and to terminate the parental rights of the respondent and Christopher's father, Dwayne W. As for the respondent, the petitioner checked the box on the petition for termination alleging that the mother had been unable or unwilling to benefit from reunification efforts. The petitioner, however, did not check the box alleging that the department had made reasonable efforts to reunify the respondent with her child. The petitioner also checked the box on the petition alleging that the respondent's child had been found in a prior proceeding to be neglected or uncared for and that the respondent had failed to achieve a sufficient degree of personal rehabilitation to encourage the belief that within a reasonable time she could assume a responsible position in the life of the child. Attached to the petition was a summary of facts offered to substantiate the petition for neglect and termination of parental rights. Included in the summary of facts was a section entitled "Reasonable Efforts," which detailed the efforts the department had made to reunify the respondent with her child.

Christopher was adjudicated neglected following a hearing that took place on December 23, 2010. Christopher thereafter was committed to the petitioner. On June 21, 2011, the petitioner filed a motion for technical correction, seeking to correct the petition for termination of parental rights by checking the box on the petition alleging that the department has made reasonable efforts to reunify the child with his mother and father.[5]

[5] The motion for technical correction also sought to correct the petition for termination of parental rights by adding the docket number T11-CP10-013758-A, and that the petitioner is the agency that had agreed to accept custody or guardianship of the child upon disposition.

The court did not rule on the petitioner's motion. A hearing was held on the petition to terminate the respondent's parental rights on June 28 and June 29, 2011.

On July 5, 2011, the court issued its decision terminating the parental rights of the respondent. In its memorandum of decision, the court outlined the extensive history that the respondent had with the department. The court noted that the respondent had attended a court-ordered psychological evaluation in November, 2010, with psychologist David Mantell, who filed a report with the court. The court pointed to elements of Mantell's report that indicated his "pessimism regarding [the respondent's] capacity for a sustained rehabilitation." The court also noted that Mantell had "serious doubts regarding allowing [the respondent] another opportunity to re-establish herself as the child's custodial parent and primary caretaker." The court then noted that Mantell's evaluation had taken place while the respondent was incarcerated, and that since her release, she had been working as a certified nurse's aide and was actively engaged in Alcoholics Anonymous. The court agreed, however, that Mantell appropriately asked, "when will we know with a reasonable level of psychological certainty that [the respondent] will be a sober and reliable parent?" The court found that Mantell believed that she would need one, two or three years of sobriety in order to answer that question, and that the child needed permanency soon. The court noted that: "[The respondent] has not been able to maintain sobriety without relapse for more than twelve months at a time." The court specifically pointed out times in [the respondent's] history when she had experienced success with her sobriety, similar to the present situation, but then had relapsed. The court noted: "Since Christopher was first in [the department's] care in 2007,

[the respondent] has expressed several times her success with sobriety. In July, 2008, [the respondent] reported to [the department] that she was sober for a year; that she attends [Alcoholics Anonymous] meetings and likes them. On August 19, 2008, [the respondent] reported to [the department] that she had started college courses to become a drug and alcohol counselor. In September, 2008, she reported she was attending groups at the Coventry House. . . . Despite [the respondent's] prior reports that she is sober and participating in [Alcoholics Anonymous], she has relapsed on each occasion." The court further stated that the respondent had expressed that she was ready for reunification with the child and that she could maintain her sobriety. The court noted, however, that she had made similar statements in the past and subsequently relapsed and put Christopher in danger.

The court found that the respondent's periods of sobriety had ranged from six months to two years. The court thereafter determined that Christopher needed stability at the present time and could not afford to wait two years to see if his mother could continue to remain sober. It then determined that the respondent could not "be counted on to safely, soberly and consistently provide care" for Christopher, and, therefore found that the petitioner had met her burden of demonstrating that the respondent had not achieved rehabilitation, as contemplated under General Statutes § 17a-112 (j) (3) (B). The court also concluded that the department had made reasonable efforts to reunify the respondent with the child. The court did not make a finding that the respondent was unwilling or unable to benefit from reunification efforts. The court thereafter terminated the respondent's parental rights. This appeal followed. Additional facts will be provided where necessary.

I

The respondent's first claim on appeal is that the trial court erred in terminating the respondent's parental rights when the petitioner did not allege in the petition for termination that the department had made reasonable efforts at reunification, and the trial court determined that the department had made such reasonable efforts. The respondent contends that the petitioner failed to check the box on the petition for termination of parental rights alleging that the department had made reasonable efforts to reunify the child with the parent and, instead, checked the box alleging that the mother was unable or unwilling to benefit from reunification efforts. Accordingly, the respondent contends that she was not provided notice of the petitioner's intention to prove that the department had made reasonable efforts at reunification.

"[I]t is well established that [w]e will not decide an appeal on an issue that was not raised before the trial court. . . . To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *In re Anna Lee M.*, 104 Conn. App. 121, 124 n.2, 931 A.2d 949, cert. denied, 284 Conn. 939, 937 A.2d 696 (2007); *Histen* v. *Histen*, 98 Conn. App. 729, 737, 911 A.2d 348 (2006); see Practice Book § 60-5. The respondent did not file an objection to the petitioner's motion for technical correction, and at no point during or after the proceedings did the respondent raise this issue before the trial court. We therefore decline to review the merits of the respondent's claim.

II

The respondent's next contention on appeal is that the court erred in concluding that the department made

reasonable efforts to reunify the child with the respondent.[6] Specifically, the respondent argues that the department did not offer services to the respondent to address the trauma she had suffered due to significant losses in her life and their impact on her alcohol abuse.[7]

Under § 17a-112 (j), in order to terminate an individual's parental rights on the basis of failure to achieve personal rehabilitation, the department must demonstrate that it made reasonable efforts to reunify the child with the parent, or prove that the parent will not benefit from such reunification efforts.[8] "In order to

---

[6] It appears from reading the respondent's brief that she may disagree that the rehabilitation of the respondent should be measured from the date of the first finding of neglect on July 31, 2007. She does not, however, address this argument in her brief. "[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003).

[7] The respondent's mother died of an aneurism in September, 1994. The father of the respondent's daughter was murdered in September, 2006. The respondent's father died in November, 2007.

[8] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding, or (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

terminate parental rights under § 17a-112 (j), the department is required to prove, by clear and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification . . . . [Section 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citation omitted; internal quotation marks omitted.) *In re Devon W.*, 124 Conn. App. 631, 642, 6 A.3d 100 (2010).

In support of her argument, the respondent cites *In re Vincent B.*, 73 Conn. App. 637, 809 A.2d 1119 (2002), cert. denied, 262 Conn. 934, 815 A.2d 136 (2003). The circumstances of the present case are, however, distinguishable from those of *In re Vincent B.* In that case, the department had determined that the respondent would be unwilling or unable to benefit from reunification services after he had failed to benefit from prior services offered to him by the department. Id., 642–44. This court overturned the termination of the respondent's parental rights because the department had not made any efforts to reunify the respondent with his

children after the respondent had successfully completed an inpatient substance abuse treatment program. Id., 645–47.

Contrary to *In re Vincent B.*, the record in the present case demonstrates that the department made reasonable efforts to reunify the respondent with her son. The respondent was offered a number of services to help her with her alcohol abuse and to assist her in achieving reunification with Christopher. As of the time that the petition for termination of parental rights was filed, the department had provided the respondent with substance abuse treatment and inpatient treatment at Coventry House that included group sessions on addiction and relapse prevention, anger management, parenting, personal development, spirituality, life skills, art therapy and group therapy. In addition, the department provided the respondent with individual counseling, family therapy, medication management, parenting education, intensive safety planning, an intercommunity mental health intensive outpatient program, pretrial alcohol education systems program at PACES Counseling Associates, Inc., and case management services. The department returned Christopher to the respondent's care twice: once when Christopher joined his mother at Coventry House, and again on May 1, 2008. Furthermore, when the respondent was incarcerated, the department arranged for supervised visitations with Christopher. On the basis of the record, it appears that the trial court's determination that the department made reasonable efforts to reunify the respondent with Christopher was not clearly erroneous.

Moreover, even if the evidence established that additional services for the respondent's trauma issues might have been beneficial, such evidence would not necessarily render the trial court's finding clearly erroneous. See *In re Melody L.*, 290 Conn. 131, 147, 962 A.2d 81 (2009); *In re Alexander T.*, 81 Conn. App. 668, 673, 841

A.2d 274 ("[i]n light of the entire record, the failure to provide the referral, while a lapse, does not make the overall efforts of the department fall below the level of what is reasonable"), cert. denied, 268 Conn. 924, 848 A.2d 472 (2004). "[R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Devon W.*, supra, 124 Conn. App. 642. On the basis of the evidence presented, we conclude that the court's finding that there was clear and convincing evidence that the department had made reasonable efforts to reunify the respondent and Christopher was not clearly erroneous.

## III

The respondent's final contention on appeal is that the court erred in concluding that she had failed to achieve sufficient personal rehabilitation. The respondent argues that she made considerable efforts to comply with the specific steps required of her in order to achieve personal rehabilitation and to achieve reunification with Christopher.

"[W]e review a trial court's finding that a parent has failed to rehabilitate herself in accordance with the rules that apply generally to a trier's finding of fact. We will overturn such a finding of fact only if it is clearly erroneous in light of the evidence in the whole record. . . . [G]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [O]n review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Jordan T.*, 119 Conn. App. 748, 755, 990 A.2d 346, cert. denied, 296 Conn. 905, 992 A.2d 329 (2010).

"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parents'] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [that the parents have] achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [they] can assume a responsible position in [their] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue. . . . As part of the analysis, the trial court must obtain a historical perspective of the respondent's child caring and parenting abilities, which includes prior adjudications of neglect, substance abuse and criminal activity." (Citations omitted; internal quotation marks omitted.) *In re Daniel C.*, 63 Conn. App. 339, 353–54, 776 A.2d 487 (2001).

The respondent argues that she made considerable efforts to achieve personal rehabilitation and to achieve reunification with Christopher. We agree that the respondent benefited from services made available to her and has made significant progress; nevertheless, the record supports the court's finding that she failed to rehabilitate sufficiently, such that she could parent Christopher within a reasonable period of time.

Meg Michaels, a social work supervisor with the department, testified: "[The respondent] has had a number of relapses, and in her relapses, she puts Christopher in danger. She gets in the car and she drives and that's putting this child at risk. Mom, this time—you

know, as we stand today, she's completed services. She's taken part in services. She's doing and she's saying the right things that she would say in order to, you know, get a child back in her care. But she said these things in the past—you know, upon the first removal. She's gone through treatment. Even after going through treatment, having the children reunified to her care, she again—2009—had another episode where she got behind the wheel of a car drinking—you know, this new episode, again, where she put Christopher in harm's way. . . . Christopher is in need of permanency. At this point in time, this child's been in care— he's going to be six in August; he's been in care for twenty-three months. He's had a number of different placements. . . . At this point, this child needs permanency. He needs consistency, reliability, stability. He needs a sober caretaker." When asked her opinion as to how long the respondent would have to demonstrate sobriety in order for reunification to take place, Michaels responded that, based on the respondent's history of substance abuse and relapse, a minimum of two years would be necessary.

Furthermore, the Manchester Memorial Hospital Ambulatory Behavioral Health treatment plan update (treatment plan update) dated May 23, 2011, which was introduced as an exhibit at the hearing, noted that the respondent presented problems of "alcohol dependence, anxiety, crying episodes, depression, flashbacks, guilt, history of multiple traumas, intrusive thoughts, legal problems, low frustration tolerance, sleep disturbance, and [u]nemployment." The treatment plan update also indicated that the reasons for continued treatment included "to prevent psychiatric hospitalization . . . adequate coping skills have yet to be established . . . patient continues to be at high risk for substance use relapse . . . [and] to build the patient's healthy defenses and self esteem."

Mantell testified that he believed that Christopher should not be returned to the respondent because her risk of relapse was too high. In his opinion, the respondent would need to remain sober and to seek treatment for several years before she could function independently on a day-to-day basis. He testified that the respondent had reported to him that she had had a history of substance abuse since she was a teenager. Mantell further testified: "And now I, on the basis of my evaluation, came to the conclusion that those factors alone indicate that the nature of her temperament, her problem solving capacity, her low frustration tolerance, her ability to generate a successful support system, the manner in which she deals with sadness and reminders of grief because of significant losses in her life cause her to decompensate to a degree that causes her children to be significantly endangered. And that did not happen once; that's happened multiple times. Therefore, there's a pattern of behavior that extended over a period, I think, of three years or perhaps more. So, I would expect that a period of rehabilitation would foresee a period of time that's at least that great, if not greater, to establish that she has the—not only the sobriety, but also the personal resources to deal with significant life stressors without decompensating again. That would be the minimum requirement to consider placing a dependent child into her care."

Further, Mantell testified that, despite the level of services she was presently engaged with, he would not recommend that the respondent be given another chance to be reunited with Christopher. Mantell stated: "What I hear you telling me is [the respondent is] off to a good start in her rehabilitation, and she has access and is using the optimal services. But the issue is when will we know with a reasonable level of psychological certainty that those services have been successful in

enabling her to remain sober and a reliable parent. My answer is not for another two to three years minimally."

On the basis of the evidence provided, the court reasonably could have determined that the respondent had failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. There was evidence presented to the court that the respondent would need to maintain her sobriety for a minimum of two years. Therefore, the court did not err in determining that the respondent had failed to achieve personal rehabilitation.

The judgment is affirmed.

In this opinion the other judges concurred.