******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE JOSEPH M., JR.*
(AC 37368)

Alvord, Prescott and Mullins, Js.

*Argued May 27—officially released July 21, 2015***

(Appeal from Superior Court, judicial district of New
Haven, Juvenile Matters, Olear, J.)

*Patrick Heeran*, assigned counsel, with whom was
*Eric H. Gaston*, assigned counsel, for the appellant
(respondent father).

*Renee Bevacqua Bollier*, assistant attorney general,
with whom, on the brief, were *George Jepsen*, attorney
general, *Benjamin Zivyon* and *Michael Besso*, assistant
attorneys general, for the appellee (petitioner).

*Thomas B. Pursell*, for the minor child.

*Opinion*

MULLINS, J. The respondent father[1] appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating his parental rights as to his minor child, Joseph M., Jr. (child).[2] The respondent claims that the court improperly determined that (1) the Department of Children and Families (department) had made reasonable efforts to reunify him with the child, (2) he was unwilling or unable to benefit from the reunification efforts, (3) he had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, he could assume a responsible position in the child's life, and (4) the termination of parental rights was in the child's best interest. We affirm the judgment of the trial court.

The record discloses the following relevant factual and procedural history. The child was born in September, 2011. During the first month of his life, the child was in the care of both his parents, who were unmarried but lived together. On October 10, 2011, the child's mother took him to his primary care pediatrician because he had been irritable and was having difficulty feeding. The pediatrician noticed that the child had a tear in his lingual frenulum, which is a thin membrane of tissue that connects the tongue to the floor of the mouth. As a result, the pediatrician referred the child to the emergency room of Yale-New Haven Children's Hospital (hospital) for further evaluation.

When the child arrived at the hospital, the medical staff became concerned that the torn frenulum was an abusive injury. The medical staff therefore notified the department about the child's admission. Afterward, the child underwent additional tests, which revealed that he also had a fractured skull, two fractured ribs, and a broken clavicle. The child's parents did not provide the medical staff with an explanation for the injuries.

Soon after the medical staff diagnosed the child's injuries, department social workers questioned the parents as to the cause of the injuries. The parents stated that they were not sure what caused the injuries, but provided multiple potential explanations, including that they unintentionally may have caused the frenulum tear when administering medication with an oral syringe, and that they accidentally may have caused the child's fractures by dropping him.[3]

After diagnosing the child's injuries, the hospital staff consulted with Andrea Asnes, a board certified physician in child abuse pediatrics. Asnes diagnosed the torn frenulum and rib fractures as "serious and life threatening physical abuse."[4] In arriving at her diagnosis, Asnes assessed the parents' explanations for the injuries, and concluded that those explanations were not plausible.[5]

Thus, according to Asnes, the child "would [have] be[en] at imminent risk of suffering another serious injury or even dying if he [were] return[ed] to his parents' care."

Consequently, on October 11, 2011, the petitioner imposed a ninety-six hour hold on the child, and removed him from his parents' physical custody. The petitioner also moved for an order of temporary custody and filed a neglect petition. The petitioner specifically charged in the neglect petition that the child was being permitted to live under conditions injurious to his well-being and that he had injuries that were at variance with the history given for them by his parents. On October 14, 2011, the court granted the order of temporary custody, and the child was placed in foster care during the pendency of the neglect petition.[6]

On December 22, 2011, both parents pleaded nolo contendere to the neglect petition, and the child was adjudicated neglected and committed to the care of the petitioner. In conjunction with the neglect adjudication, the court ordered specific steps to facilitate the child's reunification with both parents. For the respondent, those steps included, inter alia, participating in family and parenting counseling, visiting the child as often as the department permitted, receiving treatment for substance abuse, submitting to random drug tests, and cooperating with in-home support services referred by the department.

Following the adjudication of neglect, the department referred the respondent to parenting classes, scheduled frequent supervised visits for him with the child, provided him the opportunity to attend several of the child's medical appointments, and invited him to attend the department's administrative case reviews. As part of its reunification efforts, the department also monitored the respondent's compliance with substance abuse treatment for prescription medication, which he had undertaken prior to the neglect adjudication.[7] Shortly after the neglect adjudication, a department social worker suggested to the respondent that he also receive individual mental health counseling, and offered to refer him to a mental health provider.[8] The respondent replied by stating that he did not have any mental health issues, and declined treatment.

Although the respondent eventually completed a parenting program, he was inconsistent with visiting the child during the biweekly supervised visits that he was being provided. Specifically, the respondent cancelled at least two of the scheduled supervised visits each month from March, 2012, until June, 2013, and also failed to attend any of the child's medical appointments, or any of the department's administrative case reviews.

On June 12, 2013, the petitioner filed a petition pursuant to General Statutes § 17a-112 to terminate the paren-

tal rights of both parents for failure to achieve a sufficient degree of personal rehabilitation. The court previously had ordered that the child's parents undergo a psychological evaluation. The parents were evaluated by Michael Haymes, a board certified forensic psychologist. On October 18, 2013, a psychological evaluation prepared by Haymes was filed with the court (psychological evaluation). The psychological evaluation revealed several problematic areas regarding the respondent's mental health and personality.[9] Consequently, in that evaluation, Haymes diagnosed the respondent with, inter alia, "[o]ther [s]pecified [p]ersonal[i]ty [d]isorder [w]ith features of narcissistic, dependent and histrionic personality disorders."

Ultimately, the psychological evaluation recommended that the child be reunified with both parents, but only after both parents had undergone appropriate treatment. In the evaluation, Haymes suggested that, first, the child and mother be reunified after the mother engaged in psychological treatment and, second, after the mother was reunified with the child, the respondent could assume a supporting parenting role "pending [his] progressing through individual or group therapy for his personality and substance use issues . . . ." Haymes' specific recommendation for the respondent was that he should attend multigenerational family therapy with his own mother to treat his personality disorder to facilitate his reunification with the child.[10]

Following the release of the psychological evaluation, in late 2013 and into 2014, social workers from the department sent numerous letters and voicemails to the respondent in which they requested to meet with him to discuss Haymes' recommendations and attempted to refer the respondent for hair toxicology testing[11] and a domestic violence consultation.[12]

At that point, however, aside from attending supervised visitation, the respondent ceased communicating with the department. He did not respond to the department's messages, nor did he submit to the requested hair toxicology test. Moreover, even though the respondent continued to attend visitation with the child, his attendance became increasingly unreliable. Starting in February, 2014, the respondent visited the child only approximately twice per month and, even when he attended supervised visitation, he did not stay for the full two hours allotted. On March 31, 2014, the department sent the respondent a letter offering to reschedule the visitation to accommodate his work schedule. The respondent, similarly, failed to respond to that letter.

A three day trial was held on the termination of parental rights petition in late October and early November, 2014. On November 7, 2014, the court issued a memorandum of decision in which it rendered judgment terminating the parental rights of the respondent and the child's mother.

The court found that the department had made reasonable efforts to reunify the respondent with the child, the respondent was unwilling or unable to benefit from reunification efforts, and the respondent had failed to rehabilitate within the meaning of § 17a-112 (j) (3) (B) (i). The court further determined that termination of the respondent's parental rights was in the child's best interest. This appeal followed. Additional facts and procedural history will be set forth as necessary.

We begin by setting forth our standard of review and the legal principles applicable to our discussion. "Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . .

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Anvahnay S.*, 128 Conn. App. 186, 190, 16 A.3d 1244 (2011).

Our Supreme Court has determined that "[i]n order to terminate a parent's parental rights under § 17a-112, the petitioner is required to prove, by clear and convincing evidence, that: (1) the department has made reasonable efforts to reunify the family; General Statutes § 17a-112 (j) (1); (2) termination is in the best interest of the child; General Statutes § 17a-112 (j) (2); and (3) there exists any one of the seven grounds for termination delineated in § 17a-112 (j) (3)." (Footnote omitted.) *In re Samantha C.*, 268 Conn. 614, 628, 847 A.2d 883 (2004).

"[A] hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights . . . exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the [parent's] parental rights is not in the best interests of the child. In arriving at that decision, the court is mandated to consider and make written findings regard-

ing seven factors delineated in . . . § [17a-112 (k)] . . . ." (Internal quotation marks omitted.) *In re Alison M.*, 127 Conn. App. 197, 203–204, 15 A.3d 194 (2011).

With these principles in mind, we turn to the respondent's claims.

I

ADJUDICATION PHASE

The respondent makes two claims arising from the adjudication phase of the termination proceeding. First, he contends that the court improperly found that the department had made reasonable efforts to reunify him with the child. Second, he claims that the court improperly determined that he had failed to achieve personal rehabilitation, as defined by § 17a-112 (j) (3) (B) (i), so as to permit reunification with the child. Both claims will be addressed in turn.

A

Reasonable Efforts

First, the respondent claims that the court improperly determined that the department had made reasonable efforts to reunite him with the child. Specifically, the respondent contends that the department should have "ma[d]e a referral to a mental health therapist when the court ordered evaluation recommend[ed] a mental health therapist to treat [his] personality issues" and improperly "refer[red] [him] to domestic violence counseling when the court ordered evaluation indicate[d] that there are no domestic violence issues." We disagree.

"In order to terminate parental rights under § 17a-112 (j), the [petitioner] is required to prove, by clear and convincing evidence, that [the department] has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification [efforts] . . . . [Section 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous." (Internal quotation marks omitted.) *In re G.S.*, 117 Conn. App. 710, 716, 980 A.2d 935, cert. denied, 294 Conn. 919, 984 A.2d 67 (2009).

"[I]n determining whether the department has made

reasonable efforts to reunify a parent and a child or whether there is sufficient evidence that a parent is unable or unwilling to benefit from reunification efforts, the court is required in the adjudicatory phase to make its assessment on the basis of events preceding the date on which the termination petition was filed. . . . This court has consistently held that the court, [w]hen making its reasonable efforts determination . . . is limited to considering only those facts preceding the filing of the termination petition or the most recent amendment to the petition . . . ." (Internal quotation marks omitted.) *In re Kylik A.*, 153 Conn. App. 584, 596, 102 A.3d 141, cert. denied, 315 Conn. 902, 104 A.3d 106 (2014).[13]

The respondent's challenges to the court's reasonable efforts determination are premised on the department's alleged failure to comply with recommendations set forth in the psychological evaluation. In the present case, however, the petition for termination of parental rights was filed on June 12, 2013, while the psychological evaluation was not filed with the court until October 18, 2013. Thus, the psychological evaluation was released after the filing of the termination petition.

It is well settled that courts are required to consider only facts that occurred prior to the filing of the termination petition when making a reasonable efforts assessment. See id., 595–96. In the present case, the psychological evaluation was filed after the filing of the termination petition. Therefore, in determining whether the department had made reasonable efforts to reunify the respondent with the child, the court was not permitted to consider the recommendations contained in the psychological evaluation.

Here, prior to the filing of the termination petition, the department referred the respondent to parenting classes, scheduled biweekly supervised visits for him with the child, and invited him to attend the child's medical appointments and the department's administrative case reviews. Additionally, the respondent received treatment for substance abuse, which the department monitored throughout its involvement with the case. The department also offered to refer the respondent to individual therapy, which he refused.[14]

Given the presence of these facts in the record, we conclude that the court's finding that the department made reasonable efforts to reunite the respondent with his child was not clearly erroneous. The record contains ample evidence supporting the court's conclusion that the department made reasonable efforts to provide the respondent with services and opportunities to facilitate his reunification with the child.[15]

B

Personal Rehabilitation

Second, the respondent claims that the court improperly determined that he failed to achieve a sufficient

degree of personal rehabilitation pursuant to § 17a-112 (j) (3) (B) (i). We disagree.

Section 17a-112 (j) (3) (B) requires the court to find by clear and convincing evidence "that the child (i) has been found by the Superior Court . . . to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." See *In re Elvin G.*, 310 Conn. 485, 503, 78 A.3d 797 (2013).

"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [that the parent has] achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue. . . . As part of the analysis, the trial court must obtain a historical perspective of the respondent's child caring and parenting abilities, which includes prior adjudications of neglect, substance abuse and criminal activity." (Internal quotation marks omitted.) *In re Christopher L.*, 135 Conn. App. 232, 245, 41 A.3d 664 (2012).

The respondent claims that the court's conclusion that he had failed to achieve personal rehabilitation, as defined by § 17a-112 (j) (3) (B) (i), was improper because it failed to follow the recommendation, set forth in the psychological evaluation, that the respondent be reunified with the child after receiving mental health treatment. We are not persuaded.

In concluding that the respondent had failed to achieve personal rehabilitation as defined by § 17a-112 (j) (3) (B) (i), the court reasoned that "[n]either [the child's] mother nor [the respondent] has taken responsibility for or adequately explained the injuries and harm [the child] suffered and based on the credible testimony of . . . Asnes [the pediatrician specializing in child abuse], the abuse occurred on at least two occasions." The court determined that although both parents had "technically complied with many of the [specific] steps,

except for [the respondent's] inexplicable break in communication for the past nine months with the department," neither parent could safely parent the child. The court additionally observed that the respondent "demonstrated indifference at best to the need to rehabilitate himself." There is ample evidence in the record to support the court's conclusion.

Beginning in March, 2013, prior to the filing of the termination of parental rights petition, the respondent cancelled at least two of his scheduled biweekly visits with the child every month, failed to attend any of the department's administrative case reviews, and failed to attend the child's medical appointments to which he was invited.

Following the release of the psychological evaluation, the respondent completely ceased communicating with the department. The department attempted to schedule a meeting to discuss the recommendations set forth in the psychological evaluation, and tried to refer the respondent for hair toxicology testing. Department social workers left multiple voicemails with and submitted numerous letters to the respondent. The respondent failed to respond to any of the department's attempts to contact him. The department attempted to refer both parents to a domestic violence consultant due to the concerns of social workers about the control that the respondent displayed over the child's mother in their relationship.[16] The respondent refused to meet with the consultant. Finally, after the issuance of the court ordered evaluation, the respondent cut his attendance at biweekly scheduled visitation with the child even further, and attended roughly only two supervised visits per month. When the respondent did attend visitation, he merely would stay for approximately one hour of the two allocated hours. The department sent the respondent a letter offering to reschedule visitation to accommodate his work schedule. The respondent failed to respond.

At trial, Haymes was asked whether he continued to recommend that the child be reunified with his parents, as he had done in the psychological evaluation, in light of the respondent failing to enter mental health treatment and the child's mother failing to make progress on her recommended steps. Haymes replied that he no longer recommended reunifying the child with his parents.

The respondent claims that therapy for his personality disorder "was not offered, instead the [respondent] was offered domestic violence counseling." Nonetheless, we cannot comprehend how the department was supposed to refer the respondent to therapy recommended in the psychological evaluation after what the court characterized as his "inexplicable break in communication . . . with the department . . . ." Indeed, the department had made multiple attempts to contact

the respondent in order to discuss the recommendations set forth in the psychological evaluation. The respondent failed to respond to any of those efforts, thereby preventing the department from speaking with him about and following the recommendations resulting from the psychological evaluation.[17] Indeed, at trial, Haymes, the author of the psychological evaluation upon which the respondent relies, changed his recommendation and testified that he no longer recommended reunifying the child with the respondent.

Consequently, the record supports the court's conclusion that the respondent had failed to achieve personal rehabilitation, as defined by § 17a-112 (j) (3) (B) (i), so as to permit reunification with the child.[18]

## II

### DISPOSITIONAL PHASE

Finally, the respondent claims that the court improperly determined that termination of parental rights was in the best interest of the child. The respondent contends that the court "improperly balanced . . . the respective parenting abilities of the natural parents and the foster parents."[19] The petitioner responds by arguing that the court properly considered the child's bond with his foster parents and his need for permanency, and therefore properly reached the conclusion that it did. We agree with the petitioner.

We begin by setting forth the relevant law. "In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)].[20] . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Footnote added; internal quotation marks omitted.) *In re Alison M.*, supra, 127 Conn. App. 211.

The respondent takes issue with the court's findings regarding the fourth factor, namely, the feelings and emotional ties of the child with respect to the child's

parents and, in this case, foster parents. He argues that the court impermissibly "base[d] its decision [to terminate his parental rights] upon the child's need to remain with the foster family . . . ." We disagree.

In its analysis of the feelings and emotional ties of the child with respect to his parents, the court found the following: "[The child] was in the care of his parents for only one month of his short life. The evidence is that there is a positive interaction between the child and the parents at the supervised visits. The credible evidence is that [the child] is bonded to his foster family. [The child] has been placed with his foster family for the vast majority of his young life and looks to them to meet his daily needs." After considering each of the seven factors enumerated under § 17a-112 (k),[21] the trial court then found, by clear and convincing evidence, that "termination of the parental rights of the mother and father as to [the child] is in the best interest of such child."

On one hand, "[i]t is . . . improper for a termination of parental rights to be grounded on a finding that a child's prospective foster or adoptive home will be 'better' than life with one or more biological parent. On the other hand, the court is statutorily required to address in writing 'the feelings and emotional ties of the child with respect to . . . any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.' General Statutes § 17a-112 (k) (4). Although a comparison of the prospective homes and the resources of the prospective families is, viewed independently, irrelevant to and improper in the determination of whether to terminate parental rights, because the proper focus is on the ability of the biological parent and how that ability or limitation of ability relates to the best interest of the child, the court also must consider the bond that the child has developed toward both." *In re Paul M.*, 154 Conn. App. 488, 505, 107 A.3d 552 (2014). Moreover, stability and permanency of the home has long been a factor courts have considered in determining the best interest of a child. See *In re Victoria B.*, 79 Conn. App. 245, 263, 829 A.2d 855 (2003) (trial court's best interest findings not clearly erroneous when much of child's life had been spent in custody of petitioner and child needed stability and permanency).

Here, the child, who was three years old at the time of the termination of parental rights trial, had been in the care of his foster parents for all but one month of his life. Consequently, the court was required to address the child's bond with them. See General Statutes § 17a-112 (k) (4). The court stated that it "balanced the child's intrinsic need for stability and permanency against the benefits of maintaining a connection with the biological parents." In its memorandum of decision, the court did

not find that the child's foster home "[would] be 'better' than life with one or more biological parent." *In re Paul M.*, supra, 154 Conn. App. 505. Rather, the court found that the foster home, in general, provided for the child's needs, including emotional needs for love and stability. That determination was relevant to the child's bond with the foster parents, which the court statutorily was required to assess.

Moreover, in finding that termination was in the child's best interest, the trial court properly considered each of the factors enumerated in § 17a-112 (k), and thoroughly documented its conclusions regarding those factors. See footnote 21 of this opinion. Those conclusions, which need not be repeated here, are supported by the record. The importance of stability in the child's life, coupled with the trial court's amply supported finding that the respondent failed to achieve a sufficient degree of personal rehabilitation, leads us to conclude that the court properly determined, by clear and convincing evidence, that it was in the child's best interest to terminate the respondent's parental rights.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** July 21, 2015, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The court also terminated the parental rights of the respondent mother. The mother is not a party to this appeal. Accordingly, we refer to the father as the respondent.

[2] The attorney for the minor child filed a statement adopting the brief of the petitioner in this appeal.

[3] When initially questioned by a department social worker, the child's mother stated that she did not know the cause of the torn frenulum. She also stated, however, that the injury could have been caused by the child putting his fingernails into his mouth or by a pacifier cutting the inside of his mouth. The mother additionally told the social worker that the child's fractures might have happened during delivery or when he fell off a bed while being changed a few days before his admission to the hospital. When initially questioned by the social worker, the respondent stated that he did not know what caused the injuries, but that the fractures might have occurred when the child slipped from his arms.

Later, when questioned by a different department social worker, both parents stated that the child's frenulum tear occurred when they administered prescribed medication to him using an oral syringe, and that the child's fractures were caused during delivery. Neither parent reported the child's falls as a cause of the fractures in the later conversation with the second social worker.

[4] At the termination of parental rights trial, Asnes testified as an expert and opined that the torn frenulum was indicative of child abuse because the most likely explanation for that injury in an infant of the child's age was "[t]hat something was forcibly inserted into the baby's mouth causing the frenulum to be torn, forceful enough to constitute an abusive act." Asnes stated that appropriately administering medication with an oral syringe would not have caused such an injury.

Additionally, Asnes testified that she was "[e]xtremely" concerned that the rib fractures were abusive injuries because, in a child who is only one month old "there's really not a mechanism with which those sorts of rib fractures can be sustained other than a forceful squeezing of the chest wall . . . . [P]osterior rib fractures are as close to pathognomonic for a squeezing

and abusive injury as one can identify in terms of injuries."

[5] At trial, Asnes testified that although she did not consider the skull and clavicle fractures to be diagnostic of child abuse, on the basis of her skepticism of the parents' explanations for those injuries, she diagnosed those injuries as "concerning for child abuse." First, Asnes found nothing in the child's medical records that indicated that those injuries occurred during delivery. Second, although Asnes "couldn't say with certainty that a fall did not cause" the skull and clavicle fractures, she "maintained a degree of concern about those injuries as having been due to physical abuse because falls were not offered [as] an initial history to medical providers and investigating [department] personnel or to [her]." Finally, and most importantly, even if accidental falls indeed were the causes of the clavicle and skull fractures, according to Asnes, the child's rib fractures and torn frenulum resulted from child abuse due to the nature of those injuries.

[6] On November 11, 2011, the child's mother was arrested and charged with risk of injury to a child, assault in the second degree, and reckless endangerment in the first degree arising out of the child's injuries. On November 14, 2013, the child's mother entered a nolo contendere plea to the charge of risk of injury to a child. Despite the resolution of that criminal case, however, the department remained concerned that the child's parents still had not provided to them consistent or plausible explanations as to how he sustained severe injuries when he was one month old.

[7] Prior to the neglect adjudication, the respondent abused prescription medication and entered substance abuse treatment and a methadone maintenance program.

[8] Individual counseling was not listed in the court ordered specific steps, but the department social worker nevertheless offered to refer the respondent to that service.

[9] Haymes wrote in his evaluation that the respondent provided "an extremely biased self-report" in one psychological test he took, and that his tests also revealed a lie scale three standard deviations above the norm. Additionally, test results demonstrated that the respondent was "quite prone to persecutory ideas . . . [which] suggest[ed] that [he] is likely to habitually look at things from a suspicious, hostile and overtly sensitive point of view." According to the evaluation, the respondent's "profile suggest[ed] that he [was] likely to have habits of thought, emotion and behavior that negatively impact his functioning personally and interpersonally." Haymes, thus, determined that, due to his personality issues, the respondent's "relationships [were] likely to be turbulent."

As part of the psychological evaluation, the respondent also took several tests pertaining to parenting, the results of which concerned Haymes. On the "Child Abuse Potential Inventory" test, the respondent's "[l]ie scale exceeded the cutoff (twice the acceptable level of self-enhancing and fault denying responses). As a result, the instrument [was] not capable of assessing risk of his becoming physically abusive with a child." The results of the parenting tests also indicated that the respondent "would view a child with power as somewhat threatening. He would be likely to expect obedience to his demands and he may view expressions of independent thought in a child as disrespectful."

[10] Haymes opined in the psychological evaluation, however, that the respondent's "personality issues will make it difficult for him to accept the need for additional parenting resources."

[11] Both parents were in substance abuse treatment, and consistently had provided clean urine tests. Nevertheless, the department requested hair toxicology testing. Indeed, unlike the respondent, the child's mother participated in a hair toxicology test, the results of which revealed narcotic use that previously was undetected by the regular urine screenings.

[12] Department social workers referred the parents to a domestic violence consultant because they observed that the respondent displayed poor patience or impulse control, and appeared to be controlling of the child's mother, who was highly dependent on others and had made excuses for respondent's control. According to department social workers, combined with neither parent credibly explaining how the child sustained his severe injuries, the dynamic in the parents' relationship called into question the mother's ability to keep the child safe if she were reunified with him.

[13] Practice Book § 35a-7 (a) provides: "In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights."

Thus, although the court was limited to considering events that occurred prior to June 12, 2013, when it determined, pursuant to § 17a-112 (j) (1), whether the department had made reasonable efforts to reunify, the court could consider matters occurring after the June 12, 2013 filing of the termination of parental rights petition when it considered whether the degree of the respondent's rehabilitation was sufficient to foresee that he could resume a proper parental role in the child's life within a reasonable time. See *In re Kyara H.*, 147 Conn. App. 855, 865, 83 A.3d 1264, cert. denied, 311 Conn. 923, 86 A.3d 468 (2014).

[14] To the extent that the respondent claims that the department should have conducted a psychological assessment of him prior to the filing of the termination petition, that claim has no merit. Before the petitioner filed the termination petition, the petitioner filed a motion for the respondent to undergo a psychological evaluation and, at that time, the court ordered that the respondent undergo a psychological evaluation. Nonetheless, the respondent twice failed to show up for the ordered evaluation, both times stating that he was sick.

Additionally, early in the department's involvement with the case, despite the absence at that time of any diagnosed mental illness or a recommendation for individual counseling listed in the court issued specific steps, a department social worker offered to refer him to a mental health provider. The respondent replied that he had no mental health issues and refused that offer.

[15] Having reached this conclusion, we need not reach the respondent's alternative claim that the court improperly concluded that he was unable or unwilling to benefit from reunification efforts. See *In re Anvahnay S.*, supra, 128 Conn. App. 191 ("because we conclude that the court properly found, on the basis of clear and convincing evidence, that the department had made reasonable efforts to reunify the respondent and [the child], we do not reach his claim that the court improperly concluded that he was unable or unwilling to benefit from reunification efforts").

[16] In its decision, the court explained: "The department has been concerned with the possibility of domestic violence in the form of controlling behavior in the parties' relationship. It is acknowledged by the department that there have been no reported incidents of domestic violence, yet the child at one month of age suffered from abuse resulting in serious injuries to him. It remains unknown which parent (or both parents) caused the injuries. [The respondent] throughout the case has demonstrated lack of patience and poor impulse control."

[17] The respondent claims that "it is entirely predictable that [he] stopped communicating with [the department] and stopped going to supervised visitations . . . as [he] had no adequate means of defending himself because domestic violence counseling assumes the fact of domestic violence." This argument has no merit.

The court heard testimony that the department was concerned about the control dynamics in the parties' relationship, and that certain results from the psychological evaluation indicated that the respondent had issues controlling his anger. Moreover, neither parent had provided the department an explanation for the child's injuries that it considered to be plausible. The department was not certain whether there was domestic violence in the relationship without a more detailed assessment. The department, thus, referred both parents for a domestic violence consultation in order to assess whether there was any cause for concern.

The record reflects that the department was reasonable in attempting to refer that consultation. In any event, merely because the respondent took offense to that referral provided no excuse for him to cease contact with the department and to decrease his visits with the child.

[18] Because the court's conclusion that the respondent had failed to achieve a sufficient degree of personal rehabilitation is amply supported by what the court characterized as his "indifference at best to the need to rehabilitate himself," we need not address the respondent's alternative claims challenging the court's judgment: (1) that "[t]he [p]etitioner failed to prove, by clear and convincing evidence, for the purposes of a termination of parental rights petition . . . that [he] was the cause of the neglect and abuse to the child," and (2) that the court improperly linked the respondent's alleged inadequate explanation for the child's injuries with personal rehabilitation.

[19] In support of his argument, the respondent notes the following passage in the court's decision: "Based on all the foregoing, the court by clear and convincing evidence finds termination of the parental rights of the mother and [the respondent] as to [the child] is in the best interest of such child. The court concludes that subjecting [the child] to a removal from the foster

family *with whom he has bonded and with whom he can attain permanency through adoption* would not be in his best interest given the circumstances of this case." (Emphasis added.)

[20] General Statutes § 17a-112 (k) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interests of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[21] As required by § 17a-112 (k), the court made the following written findings regarding each of the seven factors: (1) the respondent was provided with "timely and appropriate services"; (2) the department made "reasonable efforts to reunite the family"; (3) the respondent "did comply with many of the steps in whole or in part; however [his] compliance has not been sufficient for the court to find that [he had] been able to rehabilitate [himself] so as to allow the court to have determined that [he] could parent [the child] in a reasonable time"; (4) the child had "positive interaction" at supervised visits with his parents, with whom he "was in the care of . . . for only one month of his short life," but he had "bonded to his foster family" with whom he had been placed "for the vast majority of his young life and [he] look[ed] to them to meet his daily needs"; (5) the child was three years of age; (6) the respondent's "attendance at visits ha[d] been irregular," he "ha[d] lately missed many visits," "ha[d] not maintained regular contact with the department," had not "contributed to [the child's] upkeep," and had not "adjusted [his] circumstances, conduct and behavior to make it in the best interest of [the child] to be reunified with [him] in the foreseeable future"; and (7) the respondent was not prevented from maintaining a relationship with the child by financial circumstances or by unreasonable conduct by third parties. In light of these factual findings, the court concluded that termination of the respondent's parental rights was in the best interest of the child.