******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE RYDER M.*
## (AC 44831)

Moll, Clark and Sheldon, Js.

*Syllabus*

The respondent father appealed to this court from the judgment of the trial court terminating his parental rights with respect to his minor child, R, who previously had been adjudicated neglected and had been in a foster home since infancy. The father claimed, inter alia, that the trial court improperly determined that the Department of Children and Families, as required by statute (§ 17a-112 (j)), had made reasonable efforts to reunify him with R and that he had failed to achieve a sufficient degree of personal rehabilitation so as to adequately demonstrate reasonable parenting ability. *Held*:

1. The trial court properly determined from clear and convincing evidence that the department made reasonable efforts to reunite the respondent father with R: the court's uncontested findings established that the department referred him to two different service providers for mental health and substance abuse issues but that both discharged him as a result of his noncompliance with their requirements, and that he elected to cease his individual counseling with another service provider, tested positive several times for marijuana use and had been arrested on drug charges; moreover, the department provided the father an opportunity to attend a fatherhood program and to visit with R, but he missed scheduled visits, struggled to engage with R and had his visitation suspended temporarily after he was observed to be under the influence of a substance during a supervised visit; furthermore, despite the father's assertion that the department did not do everything reasonable that could have been done for him, even if he would have benefited from the additional actions he suggested to facilitate reunification with R, the department's failure to do so would not defeat the court's reasonable efforts determination.

2. The respondent father could not prevail on his claim that the trial court improperly determined that he failed to rehabilitate sufficiently: clear and convincing evidence in the record supported the trial court's finding that the father failed to achieve a sufficient degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering R's age and needs, he could assume a responsible position in R's life, as there was evidence of the father's resistance to following the guidelines for services that were set for him, he was never fully able to comply with the court-ordered specific steps he had been given to facilitate reunification with R, and he did not make sufficient progress for a long enough period of time to assume that he had adequately treated his mental health difficulties, was free of illegal drugs and able to address his past trauma; moreover, despite the father's assertion that there was insufficient evidence to support the court's determination that he failed to rehabilitate sufficiently, the court made clear that it recognized he had made progress toward rehabilitation but that his efforts were too little and too late, as he was twice observed to be under the influence of a substance during visits with R, his positive tests for marijuana use reflected that he had not maintained sobriety or learned strategies to manage his life, he continued to struggle with behavioral issues, and the apartment lease he secured after having been itinerant throughout most of the underlying proceedings had been executed only six weeks before trial.

3. The trial court's determination that termination of the respondent father's parental rights was in R's best interest was legally sound and factually supported by the court's findings and conclusions with respect to the factors prescribed in § 17a-112 (k), as well as the court's conclusion regarding R's need for permanency and stability: the department made reasonable efforts to provide timely services to the father and to reunite him with R, but he was not in a position to safely care for R within a reasonable time, R, who was more than three years old at the time of trial, had developed significant emotional ties to his foster family, and

the father's lack of progress toward mastering the essential requirements of parenthood and his own emotional stability left him unable to adjust his circumstances sufficiently to have R returned to him in the foreseeable future; moreover, notwithstanding the father's assertion that termination of his parental rights was not in R's best interest, the court found that, although a bond may exist between the father and R, it did not undercut the court's best interest determination in light of the myriad of other considerations the court took into account; furthermore, any continuing efforts the father made to advance his rehabilitation did not outweigh the other factors the court considered.

Argued January 18—officially released April 20, 2022**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights as to their minor child, brought to the Superior Court in the judicial district of Middlesex, Child Protection Session at Middletown, and tried to the court, *Hon. Barbara M. Quinn*, judge trial referee; judgment terminating the respondents parental rights, from which the respondent father appealed to this court. *Affirmed*.

*David B. Rozwaski*, assigned counsel, for the appellant (respondent father).

*Jennifer C. Leavitt*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Evan M. O'Roark*, assistant attorney general, for the appellee (petitioner).

*Opinion*

MOLL, J. The respondent father, Phillip M., appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating his parental rights as to his minor son, Ryder M., on the ground that he failed to achieve a sufficient degree of personal rehabilitation pursuant to General Statutes § 17a-112 (j) (3) (B) (i).[1] On appeal, the respondent claims that the court improperly determined that (1) the Department of Children and Families (department) made reasonable efforts to reunify him with Ryder, (2) he failed to rehabilitate sufficiently, and (3) termination of his parental rights was in Ryder's best interest. We affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of this appeal. The respondent and Caroline E. began a relationship in early 2017. Ryder was born in early 2018. On March 18, 2018, the respondent was arrested for various motor vehicle violations and use of drug paraphernalia. At that time, Ryder was in the respondent's primary care. A few days later, the department received a report from one of the respondent's brothers and that brother's girlfriend that they had Ryder, then five weeks old, in their care, that they had no supplies with which to care for him, and that they did not know how long they could care for him. The respondent's brother also explained that the respondent was unable at that time to care for Ryder.

On March 23, 2018, the petitioner applied for and secured an order of temporary custody, which was sustained on March 27, 2018. Ryder was then placed in a nonrelative foster home. On May 23, 2018, Ryder was adjudicated neglected by the court, *Doherty, J.*, and was committed to the care and custody of the petitioner. The court also ordered specific steps for the respondent to take to facilitate his reunification with Ryder.

On November 15, 2019, the petitioner filed a motion to review and approve a permanency plan of termination of parental rights and adoption in the interest of Ryder. On December 11, 2019, following a hearing, the court granted the motion. On February 6, 2020, the petitioner filed a petition to terminate the parental rights of the respondent with respect to Ryder (petition).[2] In the petition, the petitioner alleged, as the ground for termination, that Ryder had been found in a prior proceeding to have been neglected, abused, or uncared for and the respondent had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Ryder, he could assume a responsible position in Ryder's life. See General Statutes § 17a-112 (j) (3) (B) (i).

A trial on the petition occurred on April 12, April 13,

and May 4, 2021. The respondent appeared and was represented by counsel. Numerous witnesses testified, including the respondent, and several exhibits were admitted into the record.

On May 14, 2021, the court, *Hon. Barbara M. Quinn*, judge trial referee, issued a memorandum of decision terminating the parental rights of the respondent. The court determined, by clear and convincing evidence, that Ryder had been adjudicated neglected on May 23, 2018, and that the respondent had failed to rehabilitate sufficiently to satisfy the requirements of § 17a-112 (j) (3) (B) (i). The court also determined that the department had made reasonable efforts to locate the respondent and to reunify him with Ryder.

The court made the following relevant findings concerning Ryder. "Ryder has been in his present foster home since he was an infant. He has thrived there and is bonded to his foster family, which includes one of [the respondent's] younger brothers who was adopted by this family. . . . [At the time of trial] Ryder [was] a few months older than three. He is an engaging, happy child and enjoys playing with his cars, watching cartoons and playing outside. He attends day care and preschool, and there are no developmental concerns about Ryder. He is learning and socializing in age appropriate ways. He is medically up to date and doing well."

In addition, the court made the following relevant findings regarding the respondent. "[The respondent] is one of seven children born to his parents. He has three older sisters and three younger brothers. His parents, he reported, were both alcoholics, and there were many incidences of domestic violence between them in the home. He and his siblings were also involved with [the department] in their younger years. They were removed from their parents three separate times; once, for the first time, when [the respondent] was fifteen [years old] and twice more when he was sixteen years old. It appears that [the respondent's] parents were not successful in having all their children returned to their care . . . .

"[The respondent] . . . was never adopted and continued to make his way as best he was able outside of [the department's] care. He was a special education student and did not graduate from high school. Nonetheless, to his credit, he has subsequently earned his general equivalency diploma (GED). While not identified in the [department's] record as such, his background and experiences in his family of origin would be expected to have caused him to experience trauma from the chaos and domestic violence he observed. He reported to one of his therapists that he was aware his childhood had impacted his own parenting skills and the choices he has made as an adult. His various mental health diagnoses . . . also support the court's conclusion.

"[The respondent] has limited family support, mostly from his father, with whom he is close and with whom he has resided from time to time. Nonetheless, due to their [department] history, neither his mother nor his father are potential resources for him so that Ryder could have been placed with them after he was removed from his parents' care in 2018.

"As an adult, [the respondent] has had a sporadic work history, primarily employed in landscaping on a seasonal basis and often being paid in unofficial ways. He has been homeless or itinerant and [was] not able to be located at times in the early months after Ryder's removal. More recently, since late 2019, [the respondent] has been employed by a landscaping and contracting business with a more official standing and payroll history. Unfortunately, his employment in landscaping means he has been unemployed during the winter months on a regular basis and secured unemployment compensation. To combat this difficulty, over this past winter, [the respondent] took as his primary job a position at Cumberland Farms and only works part-time in landscaping. As yet, [the respondent] has not provided [the department] a wage stub to demonstrate his legal employment, as required by the specific steps issued for him.

"His current landscaping employer testified that [the respondent] is a good worker with considerable skills. His employer stated that he has tried to accommodate his visits with Ryder and to assist him in his attendance at other required services. [The respondent] does not have his own transportation and often secures rides from others or walks to where he needs to be. His employers have at times provided him with that assistance." (Footnote omitted.)

The court further found that, in addition to the standard provisions of the specific steps, the respondent was directed to meet detailed, well-tailored goals relating to substance abuse treatment, mental health treatment, and parenting. The court explained, by way of summary, that "[t]he testimony at trial reviewed [the respondent's] lengthy involvement with many service providers, the rejection of most of the providers to which [the department] had referred him and his choice of his own selected providers. His conduct demonstrated his significant need and insistence on controlling the services he accepted. He rejected those services which required strict supervised, random drug testing and focused individual counseling during which he and his therapist would have worked together to address his past trauma and mental health. His insistence on selecting his own services which did not comply with the [department's] directives of what was needed for him ultimately led to his failure to make any meaningful progress on the very detailed goals for rehabilitation set by the court for reunification with [Ryder]. Despite his belief that he has complied with such services and

the great efforts he has made to attend and comply, he himself sadly sabotaged those efforts.''

With respect to substance abuse and mental health treatment, the court found the following facts. At the start of the neglect proceedings, the department specifically referred the respondent for substance abuse assessment and treatment. It became known, and the respondent admitted at trial, that he had regularly used heroin in the past. Initially, he was referred to the McCall Foundation for combined substance abuse assessment and treatment (which included weekly urine screens), mental health services, and medication management. The respondent was not compliant with the program and was discharged in June, 2018. The respondent then was referred to a second provider, MCCA of Torrington,[3] but he did not comply with the requirements of the program, refused to submit to random urine screens, and was discharged for noncompliance in November, 2018. The department again referred the respondent to MCCA of Torrington, but he did not return there.

In January, 2019, the department referred the respondent to the Apt Foundation for treatment, after which, by his own choice, services were transferred to the Root Center[4] in February, 2019. He underwent a mental health evaluation, which diagnosed him with post-traumatic stress disorder and anxiety. He was prescribed medication to treat his anxiety. Upon successfully completing an intensive outpatient program, the respondent met with a clinician for weekly counseling.

Although services were provided to the respondent by the Root Center for the first few months in the manner that the department had directed, ''soon, by his own choice and the program's needs, the services stopped providing the oversight and the mental health services required for him to rehabilitate.'' Initially, the Root Center provided weekly urine screens. In February, 2019, the respondent had five positive urine screens for marijuana. By April, 2019, the urine screens were provided every four to eight weeks in a manner that was predictable, in that ''they only occurred when [the respondent] returned for his medications, clearly a time known to and chosen by him and the program,'' and unsupervised. The court continued: ''The Root Center's failure to provide supervised, truly random drug screens had its negative consequences for [the respondent's] rehabilitation. In September of 2019, [the respondent] was arrested for possession of drug paraphernalia and marijuana. When [he] next spoke with [a department] social worker, he admitted to the facts of the arrest. While he complained that [the department] could have secured more frequent drug testing by payment to the Root Center, [which] had only limited funding for such screens, such payment would not have secured their actual randomness or their supervision by the Root Center. [The department] never followed up on the payment request.''

The respondent tested positive for marijuana in 2018, 2019, and 2020, with the most recent positive test coming on December 20, 2020. As the court observed, the respondent's marijuana use, "when it has been discovered, reveals that [he] has not yet managed to maintain his sobriety or learned strategies to manage his life as the specific steps require. His obligation, among others, was to learn alternative strategies to cope with the stresses of his life."

At the time he began receiving services at the Root Center, the respondent was taking Suboxone for his opiate dependence. At some point, "[the respondent] self-determined to stop his Suboxone use to stem his cravings for opiates. He then began methadone maintenance in 2019 with the Root Center and had further meetings with the condition that mental health treatment tapered off. That opiate use has presented a problem to him in his life became apparent as well during his own testimony about his methadone treatment by the substance abuse center. Over time, the Root Center had reduced his dosage to five [milligrams] daily. He testified that this level of support made him feel so sore and achy and unwell that he requested a significant increase in his dosage back to forty-eight [milligrams] a day, a dosage he continues to receive."

Additionally, the individual counseling that the respondent was receiving ceased at his request following a recommendation that he seek approval for and obtain a medical marijuana card, which he took no steps to acquire. The only mental health treatment that remained ongoing in 2019 was "the medication management regimen, palliative measures to keep him functioning." The court determined that, "[s]uch medication, however, cannot substitute for individual counseling to assist him in learning coping skills and help him to understand his past significant trauma and develop the necessary coping skills."

In September, 2020, the department made two final attempts to refer the respondent to more appropriate programs with consistent oversight regarding substance abuse and individual mental health treatment. First, the department referred the respondent to Stokes Counseling, which he refused, claiming that the Root Center provided him with sufficient services. Thereafter, the department referred the respondent to the Watkins Network. On October 2, 2020, at an intake session, the respondent refused to submit to a drug screen, ranted and raved at the staff, and abruptly left, never to return. The court inferred from the respondent's refusal that a drug screen would have revealed illegal drug use. The court also found that his behavior "further demonstrated that he was unable to keep his conduct under control and to cooperate with his service providers, as required by the specific steps. Whatever he may have learned during [certain] domestic violence

sessions mandated by the court in 2018 had not enabled him to more permanently control his temper and develop coping skills to manage his stress. In his own testimony, he also admitted to having a temper, which he found difficult to control at times. His conduct is further evidence of his significant need for individual mental health treatment to deal with his past history of trauma and ability to manage himself." In the months leading up to trial, the respondent began regularly attending group treatment at the Root Center to address his mental health; initially, however, his attendance at group treatment was sporadic as a result of a conflict that he had with another participant.

With respect to the parenting component of the respondent's rehabilitation obligations, the court made the following relevant findings. Although the respondent successfully completed a fatherhood program and had regular weekly visits with Ryder (which were provided physically and, after the COVID-19 pandemic began, virtually), it was apparent in those visits that he had not yet fully learned the required parenting skills. He did not regularly bring food or toys for Ryder or projects to undertake with Ryder. Often unable to engage Ryder, the respondent did not comprehend the effect of his mental health difficulties on Ryder and on his ability to engage with Ryder. Ryder's foster mother offered for the respondent to have in-person visits with Ryder in her home, but after a few visits, the offer was withdrawn as a result of the respondent being belligerent. In addition, the respondent missed visits from time to time. With respect to missed virtual visits, the respondent accused the department of "sabotaging his virtual visits" and offered a variety of excuses; however, the court found the respondent's excuses "not fully credible" and "to be part of his excuse-prone behavior."

Further, there were two visits with Ryder during which the respondent was observed to be under the influence of some substance. The first occasion occurred during a supervised visit in 2018, and the respondent did not refute the claim when confronted by the department about his apparent drug use on that day. The respondent's visits were suspended for a period of time following that incident. The second occasion occurred in 2020 during a virtual visit. A department case aide reported that the respondent was unkempt and had pinpoint pupils, slurred speech, and a lack of energy. Subsequent to that visit, the respondent missed two visits in July, 2020, and five more visits between the end of August and early October, 2020. The court determined that the respondent's "drug use on these occasions . . . impact[ed] [Ryder] and, while he was often able to remain sober, there were times when he could not accomplish this important task."

Finally, with regard to the general requirements of the specific steps, the court focused on two areas where

the respondent failed to comply, namely, the requirements (1) to maintain adequate housing and to keep the department informed of his whereabouts, and (2) to cooperate with service providers. The court found that, throughout most of the underlying proceedings, the respondent was unable to maintain adequate housing, which would have included "a living arrangement suitable for a child." (Internal quotation marks omitted.) The respondent was itinerant for much of that time, and there were many occasions when the department did not know where he was residing, "as he was quite secretive about the personal aspects of his life and also resided with his father for months at a time." The residence of the respondent's father was not deemed adequate housing because of the father's child protection history. The court further found that, six weeks before trial, the respondent had signed a lease for his own apartment, where he was residing at the time of trial. Although commending the respondent for securing his own housing, the court deemed his efforts to be "too little [and] too late." Additionally, the respondent failed to notify the department of the lease, such that the department was unable to inspect the apartment to determine whether it was suitable and adequate housing.

With respect to cooperating with service providers, the court found that the respondent's cooperation was "very low, as he blames [the department] for everything that has befallen him, including the enormous demands on his time to attend required services. It is certainly a daunting task to undertake all that is required of him, and he has made great efforts . . . but only on the terms he dictates. He has refused to undertake the hard personal work that is required for ongoing personal change and growth. His frustration and belligerence to [department] staff and service providers demonstrate his failure to master several important life tasks. He has been unable to admit fully and take responsibility for his own role in losing custody of [Ryder]. He has been unable to curb his frustration and anger. He has been unable to acknowledge his own past deficits, which prevent him from properly parenting [Ryder] and making the necessary personal changes to demonstrate some significant rehabilitation. Projecting his own deficits on others does not help achieve the required understanding, nor can it lead to meaningful change."

In light of the foregoing findings, the court determined that there was clear and convincing evidence that (1) the department made reasonable efforts to reunify the respondent with Ryder, and (2) the respondent failed to rehabilitate sufficiently.[5] The court then determined that terminating the respondent's parental rights was in Ryder's best interest. Accordingly, the court rendered judgment terminating the parental rights of the respondent and appointing the petitioner as Ryder's statutory parent. This appeal followed.[6] Addi-

tional facts and procedural history will be set forth as necessary.

Before turning to the respondent's claims, we set forth the following relevant legal principles. "Proceedings to terminate parental rights are governed by § 17a-112. . . . Under [that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. The [petitioner] . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . Subdivision (3) of § 17a-112 (j) carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun." (Internal quotation marks omitted.) *In re Tresin J.*, 334 Conn. 314, 322–23, 222 A.3d 83 (2019).

Section 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding, or (ii) is found to be neglected, abused or uncared for and has been in the custody of the [Commissioner of Children and Families] for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

I

The respondent first claims that the trial court

improperly determined that the department made reasonable efforts to reunify him with Ryder. We disagree.[7]

The following legal principles and standard of review are relevant to our resolution of this claim. "Section 17a-112 (j) (1) requires that before terminating parental rights, the court must find by clear and convincing evidence that the department has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate . . . . Thus, the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by a previous judicial determination that such efforts were not appropriate." (Internal quotation marks omitted.) *In re Corey C.*, 198 Conn. App. 41, 58, 232 A.3d 1237, cert. denied, 335 Conn. 930, 236 A.3d 217 (2020). "[I]n determining whether the department has made reasonable efforts to reunify a parent and a child . . . the court is required in the adjudicatory phase to make its assessment on the basis of events preceding the date on which the termination petition was filed. . . . This court has consistently held that the court, [w]hen making its reasonable efforts determination . . . is limited to considering only those facts preceding the filing of the termination petition or the most recent amendment to the petition . . . ." (Emphasis omitted; internal quotation marks omitted.) *In re Cameron W.*, 194 Conn. App. 633, 660, 221 A.3d 885 (2019), cert. denied, 334 Conn. 918, 222 A.3d 103 (2020).

Our review of the court's reasonable efforts determination is subject to the evidentiary sufficiency standard of review. See *In re Corey C.*, supra, 198 Conn. App. 59. Under this standard, the inquiry is "whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Internal quotation marks omitted.) Id., 67. The court's subordinate findings made in support of its reasonable efforts determination are reviewed for clear error. Id.

In light of its detailed findings in its decision, which we summarized previously in this opinion, the court determined from clear and convincing evidence that the department had made reasonable efforts to reunify the respondent with Ryder. As the court found, "[the respondent] demonstrated substance abuse difficulties, lack of parenting skills and past trauma, which required

mental health treatment. There is no question that referrals were made to services reasonably tailored to address those problems and needs to be able for him to be reunified with Ryder."

The respondent does not contest the court's subordinate findings made in support of its reasonable efforts determination; rather, he claims that "not everything reasonable that could have been done was offered to [him]," maintaining that the department failed (1) to work with his therapist at the Root Center to address its issues and concerns about his behavior and (2) to "follow up with the [respondent] regarding assuring that he was engaged with proper services" by, for example, seeking a court-ordered evaluation.[8] We are not persuaded.

"[Section 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn." (Internal quotation marks omitted.) *In re Corey C.*, supra, 198 Conn. App. 59. "[R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Citation omitted; internal quotation marks omitted.) *In re Unique R.*, 170 Conn. App. 833, 855, 156 A.3d 1 (2017). "[O]ur courts are instructed to look to the totality of the facts and circumstances presented in each individual case in deciding whether reasonable efforts have been made." (Internal quotation marks omitted.) *In re Corey C.*, supra, 65.

The court's uncontested findings establish that the department took various steps to facilitate the respondent's reunification with Ryder before the petitioner sought to terminate the respondent's parental rights. In 2018, the department referred the respondent to two different providers offering mental health and substance abuse services, but he was discharged from both as a result of his noncompliance. Once engaged with the Root Center in February, 2019, the respondent received access to mental health and substance abuse services; however, he elected to cease his individual counseling and continued to struggle with substance abuse, as evidenced by several positive marijuana tests and his admission to the facts of his arrest in September, 2019, for possession of drug paraphernalia and marijuana.[9] In addition, the respondent was provided an opportunity to attend a fatherhood program and to have visitation with Ryder; however, he often struggled to engage

with Ryder, missed scheduled visits, and had his visitation suspended temporarily after having been observed to be under the influence of a substance during a supervised visit in 2018.

Put simply, the court's uncontested cumulative findings amply support its reasonable efforts determination. Thus, even if the respondent would have benefited from the department's taking the additional actions he suggested to facilitate his reunification with Ryder, the department's failure to do so would not defeat the court's reasonable efforts determination. See *In re Melody L.*, 290 Conn. 131, 147, 962 A.2d 81 (2009) (assuming evidence existed that respondent would have benefited from additional family therapy, such evidence would not undermine court's reasonable efforts determination), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 91 A.3d 862 (2014); *In re Christopher L.*, 135 Conn. App. 232, 243, 41 A.3d 664 (2012) (assuming evidence existed that respondent would have benefited from additional services addressing respondent's trauma issues, such evidence would not undermine court's reasonable efforts determination).

In sum, we reject the respondent's claim that the court improperly determined that the department made reasonable efforts to reunify him with Ryder.

II

The respondent next claims that the trial court improperly determined that he had failed to rehabilitate sufficiently. We are not persuaded.

We begin by setting forth the following relevant legal principles and standard of review. "Pursuant to § 17a-112, [t]he trial court is required . . . to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . Rehabilitate means to restore [a parent] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when [he or she] will be able to assume a responsible position in [his or her] child's life. Nor does it require [him or her] to prove that [he or she] will be able to assume full responsibility for [his or her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he or she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in [his or her] child's life. . . . In addition, [i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department.

. . .

"When a child is taken into the [petitioner's] custody, a trial court must issue specific steps to a parent as to what should be done to facilitate reunification and prevent termination of parental rights. . . . Specific steps provide notice and guidance to a parent as to what should be done to facilitate reunification and prevent termination of [parental] rights. Their completion or noncompletion, however, does not guarantee any outcome. A parent may complete all of the specific steps and still be found to have failed to rehabilitate. . . . Conversely, a parent could fall somewhat short in completing the ordered steps, but still be found to have achieved sufficient progress so as to preclude a termination of his or her rights based on a failure to rehabilitate. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather whether [he or she] has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) *In re Omar I.*, 197 Conn. App. 499, 578–79, 231 A.3d 1196, cert. denied, 335 Conn. 924, 233 A.3d 1091, cert. denied sub nom. *Ammar I.* v. *Connecticut*,     U.S.     , 141 S. Ct. 956, 208 L. Ed. 2d 494 (2020). The court's determination that the respondent failed to rehabilitate sufficiently is subject to the evidentiary sufficiency standard of review, and we will not disturb the court's subordinate findings vis--vis that determination unless they are clearly erroneous. Id., 579–80; see also part I of this opinion.

In determining that the respondent failed to rehabilitate sufficiently, the court found that the respondent had "consistently made considerable effort, [which is] to be applauded. But such effort as was made was always undermined by dictating his own terms as to what was needed. He did not recognize that he was not in a good position to independently determine those needs. [The respondent], the court finds from the clear and convincing evidence, has not been able to rehabilitate adequately to demonstrate reasonable parenting ability. He has not been able to demonstrate, given his resistance to following the guidelines for services set for him, that he could do so in the reasonable foreseeable future, given the age of [Ryder] and the time [Ryder] has already spent in care, almost his entire young life. The clear and convincing evidence, the court concludes, permits of no other conclusion." Additionally, the court found that "[the respondent] has never been fully able to comply with the steps ordered for him. The clear and convincing evidence demonstrates that he has not made sufficient progress for a long enough period of time to assume he is stable, has adequately treated his mental health difficulties, including through medication, and is free of illegal drugs and has a safety plan prepared in case of any expected relapse. He has not been able to address his past trauma or learned strate-

gies to cope with it and the stresses it causes in his life. The evidence demonstrates that this was so both on the adjudicatory date in 2020 and in the year that has elapsed since that time. While some evidence of changes in [the respondent's] behavior and outlook was shown, it was unfortunately too little and too late for him to assume Ryder's care. [The respondent] is still not in a position for the court to conclude, from the clear and convincing evidence, that he could reasonably be safely able to care for [Ryder], now or in the near future, given Ryder's need for stability and permanency."

The respondent maintains that there was insufficient evidence to support the court's determination that he had failed to rehabilitate sufficiently. To support that argument, he relies on evidence in the record reflecting that he (1) completed domestic violence and parenting programs, (2) had executed a lease for an apartment shortly before trial, (3) was working two separate jobs, and (4) was continuing to benefit from services that he was receiving at the Root Center. He also cites evidence indicating that he had productive visits with Ryder, who showed him affection during visitation.

The court's decision makes clear that the court recognized that the respondent had made some progress toward rehabilitation; however, the court deemed the respondent's efforts to be "too little and too late for him to assume Ryder's care." As the court found, the respondent's substance abuse problems remained unresolved, given that (1) twice he was observed to be under the influence of a substance during visits with Ryder, once in 2018 and again in 2020, and (2) he tested positive for marijuana in 2018, 2019, and as recently as late December, 2020, reflecting that he had "not yet managed to maintain his sobriety or learned strategies to manage his life as the specific steps require[d]." The department referred him to two new providers in September, 2020, to supply him with more appropriate services, but he refused to attend them. Additionally, he continued to struggle with behavioral issues, as evidenced by his belligerent conduct toward department staff, Watkins Network staff during an intake session in October, 2020, and Ryder's foster mother during in-person visits. He began attending group treatment to address his mental health at the Root Center regularly only a few months before trial, and his initial attendance was sporadic as a result of a conflict with another participant. With respect to Ryder, although he expressed love for Ryder and wanted Ryder in his care, the respondent often struggled to engage with Ryder during visits, appeared to be under the influence of a substance on the two aforementioned occasions, and missed visits, including virtual visits for reasons the court found not fully credible. Moreover, although the respondent managed to secure a lease for an apartment after being itinerant throughout most of the underlying proceed-

ings, the lease was executed only six weeks before trial.[10] The respondent does not challenge these subordinate findings.[11]

Collectively, the court's subordinate findings are sufficient to demonstrate that the respondent failed to rehabilitate sufficiently. The evidence of the respondent's progress, which the court acknowledged, does not undermine that determination. See *In re Sheila J.*, 62 Conn. App. 470, 481–82, 771 A.2d 244 (2001) (court's determination that respondent failed to rehabilitate sufficiently was proper notwithstanding respondent having demonstrated efforts and taken steps toward rehabilitation, which were "too little and too late").

In sum, we reject the respondent's claim that the court improperly determined that the respondent failed to rehabilitate sufficiently.

### III

The respondent's final claim is that the trial court improperly determined that terminating his parental rights was in Ryder's best interest. We disagree.

"We first set forth the following applicable legal standards. In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the [respondent's] parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven statutory factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence. . . .

"[T]he fact that the legislature [had interpolated] objective guidelines into the open-ended fact-oriented statutes which govern [parental termination] disputes . . . should not be construed as a predetermined weighing of evidence . . . by the legislature. [If] . . . the record reveals that the trial court's ultimate conclusions [regarding termination of parental rights] are supported by clear and convincing evidence, we will not reach an opposite conclusion on the basis of any one segment of the many factors considered in a termination proceeding . . . . Indeed . . . [t]he balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a

child's best interest is entitled to the utmost deference. . . . [A] trial court's determination of the best interests of a child will not be overturned on the basis of one factor if that determination is otherwise factually supported and legally sound." (Citations omitted; footnote omitted; internal quotation marks omitted.) *In re Jacob M.*, 204 Conn. App. 763, 787–89, 255 A.3d 918, cert. denied, 337 Conn. 909, 253 A.3d 43 (2021), and cert. denied sub nom. *In re Natasha T.*, 337 Conn. 909, 253 A.3d 44 (2021).

The court addressed each of the § 17a-112 (k) factors[12] in the dispositional portion of its decision. The court made the following relevant findings. First, the department made reasonable efforts to provide timely services to the respondent to facilitate a reunion with Ryder, in particular mental health, substance abuse, and parenting services, but the respondent continued to struggle with those services and "was not able to change his behavior and comprehend the true risk of drug use and untreated mental health issues to himself or to reunification with [Ryder]. He was also offered regular, supervised visitation and case management services."[13] Second, the department made reasonable efforts to reunite the respondent and Ryder in light of the services made available to the respondent, who "has had more than adequate time to demonstrate steps toward his rehabilitation," and the length of time Ryder had been in care. Third, the respondent failed to complete most of the specific steps ordered by the court and "is not in a position to safely care for [Ryder] within a reasonable period of time, as he cannot yet conduct himself in the manner required to parent Ryder safely and provide for [Ryder's] emotional welfare." Fourth, although Ryder recognized the respondent and engaged with him during visits, Ryder had developed significant emotional ties to his foster family, with whom he has lived since being six weeks old and who has provided him with stability along with daily comfort and care. Fifth, Ryder was more than three years old at the time of trial. Sixth, although the respondent had attended most of his scheduled visits with Ryder, he was unable to adjust his circumstances sufficiently to have Ryder returned to him in the foreseeable future "given his . . . lack of progress toward mastering the essential requirements of parenthood as well as his own emotional stability."[14]

After discussing the § 17a-112 (k) factors, the court found that "[n]either of [Ryder's] parents is available to care for him . . . . [The respondent] is not yet ready to assume [Ryder's] proper care, nor can he, in the reasonably foreseeable future, given Ryder's young age and needs for permanency. Ryder needs adult caretakers who can provide the stability and consistency of care he requires." In light of "Ryder's age and the totality of the circumstances," the court determined, by clear and convincing evidence, that terminating the respon-

dent's parental rights was in Ryder's best interest.

The respondent does not challenge any particular finding made by the court in support of its best interest determination. Instead, the respondent claims that termination of his parental rights was not in Ryder's best interest on the basis of (1) the clear parent-child relationship that he shared with Ryder and (2) his continuing progress in rehabilitating himself.[15] We are not persuaded.

As to the respondent's contention that his parent-child relationship with Ryder militated against the court's best interest determination, the court found that the respondent has affection for Ryder, and that Ryder recognized the respondent and engaged with him during visits. Nevertheless, "[a]s this court has explained, the appellate courts of this state consistently have held that even when there is a finding of a bond between [a] parent and a child, it still may be in the child's best interest to terminate parental rights." (Internal quotation marks omitted.) *In re Phoenix A.*, 202 Conn. App. 827, 850, 246 A.3d 1096, cert. denied, 336 Conn. 932, 248 A.3d 1 (2021); see also *In re Sequoia G.*, 205 Conn. App. 222, 231, 256 A.3d 195 ("the existence of a bond between a parent and a child, while relevant, is not dispositive of a best interest determination" (internal quotation marks omitted)), cert. denied, 338 Conn. 904, 258 A.3d 675 (2021). That a bond may exist between the respondent and Ryder does not undercut the court's best interest determination in light of the myriad of other considerations taken into account by the court.

Turning to the respondent's assertion that he has been making progress in rehabilitating himself, although the court recognized that the respondent had made some recent strides in his life, the court also found that he continued to struggle with the mental health, substance abuse, and parenting services offered to him by the department, and that he was unable to alter his conduct or to understand the danger of drug use and untreated mental health issues to himself or to his reunification with Ryder. Although commendable, any continuing efforts made by the respondent to advance his rehabilitation do not outweigh the other factors considered by the court with respect to whether termination of the respondent's parental rights was in Ryder's best interest. See *In re Anaishaly C.*, 190 Conn. App. 667, 692, 213 A.3d 12 (2019) (trial court did not err in determining that termination of respondents' parental rights was in children's best interests when respondents "successfully complet[ed] some programs" but were "unsuccessful, or noncompliant, with others" (internal quotation marks omitted)); *In re Malachi E.*, 188 Conn. App. 426, 445–46, 204 A.3d 810 (2019) (trial court's finding that respondent was making progress in rehabilitating herself did not undermine court's determination that termination of respondent's parental rights was

in child's best interest, which was supported by other findings that were undisputed); *In re Daniel A.*, 150 Conn. App. 78, 104, 89 A.3d 1040 (trial court's finding that respondent made efforts to rehabilitate himself did not undermine court's best interest determination), cert. denied, 312 Conn. 911, 93 A.3d 593 (2014).

"On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Omar I.*, supra, 197 Conn. App. 584; see also *In re Jacob M.*, supra, 204 Conn. App. 790 ("[w]e will not scrutinize the record to look for reasons supporting a different conclusion than that reached by the trial court" (internal quotation marks omitted)). We conclude that the court's determination that termination of the respondent's parental rights was in Ryder's best interest was factually supported and legally sound.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** April 20, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The trial court also rendered judgment terminating the parental rights of Ryder's mother, Caroline E. Caroline E. has not appealed from the judgment terminating her parental rights, and, therefore, we refer in this opinion to Phillip M. as the respondent.

[2] The petitioner also sought to terminate the parental rights of Caroline E. The judgment terminating the parental rights of Caroline E. is not at issue in this appeal. See footnote 1 of this opinion.

[3] Although not identified in the court's decision, the record indicates that MCCA of Torrington was the second provider to which the department referred the respondent.

[4] The record reflects that the Root Center was previously known as the Hartford Dispensary, a designation used in the record synonymously with the Root Center. For ease of reference, we refer to this entity as the Root Center.

[5] The court also determined that the department made reasonable efforts to locate the respondent and that he "was able to meaningfully participate in these proceedings and receive services." The respondent does not contest that determination on appeal.

[6] The attorney for Ryder has adopted the petitioner's appellate brief.

[7] The respondent also appears to claim that the court improperly determined that he was unable or unwilling to benefit from reunification efforts under § 17a-112 (j) (1). Pursuant to § 17a-112 (j) (1), the petitioner must prove *either* that the department "has made reasonable efforts to reunify *or, alternatively*, that the parent is unwilling or unable to benefit from reunification efforts." (Emphasis in original; internal quotation marks omitted.) *In re Paul O.*, 141 Conn. App. 477, 485, 62 A.3d 637, cert. denied, 308 Conn. 933, 64 A.3d 332 (2013). Section 17a-112 (j) clearly provides that the petitioner "is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Internal quotation marks omitted.) Id. Thus, insofar as the respondent is raising this claim,

we need not address it in light of our conclusion that the court did not commit error in determining that the department made reasonable efforts to reunify the respondent with Ryder. See id. ("[b]ecause we have concluded that the court properly found, on the basis of clear and convincing evidence, that the department had made reasonable efforts to reunify the respondent and [the respondent's child], we do not reach the respondent's claim that the court improperly concluded that he was unable or unwilling to benefit from reunification efforts").

[8] The respondent also contends that it was unreasonable for the department to refer him to new service providers in September, 2020, to "restart services" rather than taking other measures, such as paying the Root Center to conduct more frequent urine screens or seeking a court order for a hair test. This argument is predicated on events that followed the petitioner's filing of the petition to terminate the respondent's parental rights on February 6, 2020, such that they are not proper to consider vis--vis the court's reasonable efforts determination. See *In re Cameron W.*, supra, 194 Conn. App. 660.

The record reflects that the court twice granted motions filed by the petitioner to make "technical correction[s]" to the petition, once on March 4, 2020 (correcting improperly checked boxes on the petition form) and once on March 30, 2021 (correcting the respondent's date of birth). In both motions, the petitioner incorporated by reference the summary of facts filed in support of the petition filed on February 6, 2020, and indicated that the adjudicatory date was not affected. We do not construe these technical corrections to be amendments permitting the consideration of events past the filing date of the petition with regard to whether the department made reasonable efforts to reunify the respondent with Ryder.

[9] In a department social study dated February 3, 2020, which was admitted as a full exhibit at trial, there is an entry indicating that the respondent "recently admitted to using [m]arijuana, following his arrest for [p]ossession of [d]rugs, [m]arijuana on [September 26, 2019]."

[10] The court also found that, as a result of the respondent's failure to notify the department of the lease, the department was unable to inspect the apartment to determine whether it was suitable and adequate housing. The respondent cites his own testimony at trial indicating that he informed the department of his lease, a copy of which was part of the record as a full exhibit. At trial, a department social worker testified that she was unaware that the respondent had a lease and that, notwithstanding having requested that he submit any housing lease that he executed to the department, he did not inform her of the lease or provide her with a copy of the lease. Thus, insofar as the respondent disputes the court's finding that he failed to inform the department of his lease, that finding is supported by the record.

[11] The respondent argues that, contrary to the court's reasoning that he "was selecting services that he wanted to engage in, [he] was able to engage in services when he was directed toward appropriate services." He seemingly disputes the court's finding that he elected to attend the Root Center voluntarily by asserting that the department referred him to the Root Center, where he remains engaged for treatment. He overlooks, however, that he was discharged from or declined to attend four different service providers to which the department had referred him. Regardless of whether he attended the Root Center of his own volition or because of a referral by the department, the record supports the court's observation that the respondent had an insistence on self-selecting his own services.

[12] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent

has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[13] The court also found that the department provided services to support Ryder, although Ryder did not require any special services.

[14] In addressing the seventh statutory factor, the court found that the respondent was not prevented from maintaining a meaningful relationship with Ryder by economic circumstances or by the acts of Caroline E. or any other person. See General Statutes § 17a-112 (k) (7).

[15] The respondent cites testimony that he offered at trial reflecting that "he would do everything that he could to maintain his parental rights and work toward reunification with [Ryder]." Insofar as the respondent is maintaining that he should have been afforded more time to rehabilitate himself before the court terminated his parental rights, "we recently have noted that such an argument is inconsistent with our Supreme Court's repeated recognition of the importance of permanency in children's lives. . . . *In re Ja'La L.*, 201 Conn. App. 586, 596, 243 A.3d 358 (2020), [cert. denied, 336 Conn. 909, 244 A.3d 148 (2021)], citing *In re Davonta V.*, 285 Conn. 483, 494–95, 940 A.2d 733 (2008)." (Internal quotation marks omitted.) *In re Phoenix A.*, 202 Conn. App. 827, 847 n.4, 246 A.3d 1096, cert. denied, 336 Conn. 932, 248 A.3d 1 (2021).